UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DENNIS DILIBERO,

      Petitioner,

v.

MATTHEW DIVRIS,

      Respondent.

No. 21-cv-30094-RGS

## REPORT AND RECOMMENDATION ON PETITION FOR WRIT OF HABEAS CORPUS

CABELL, U.S.M.J.

## I.   INTRODUCTION

Petitioner Dennis DiLibero ("DiLibero" or "Petitioner") is currently serving a term of incarceration of 10 to 15 years following his state court conviction for aggravated rape of a child in violation of M.G.L. c. 265, § 23A.  He contends that he received ineffective assistance of counsel before and during trial and petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, seeking to vacate his conviction.  The matter has been referred to this court for a report and recommendation.  For the reasons discussed below, I recommend that the petition be denied.

## II.  RELEVANT BACKGROUND

On October 12, 2016, a Bristol County Superior Court jury convicted the petitioner on the charge of rape of a child (the petitioner's grandson) aggravated by age, namely by forcing the

child to perform an oral sex act.  The petitioner moved for a new trial, which the court denied, and the petitioner appealed both the denial and his conviction to the Massachusetts Appeals Court ("MAC").  The MAC affirmed the petitioner's conviction and upheld the trial court's denial of the motion for a new trial. *Commonwealth v. Delibero*[1], 147 N.E.3d 1127 (Mass. App. Ct. 2020), rev. denied, 157 N.E.3d 578 (Mass. 2020).  The petitioner appealed but the Supreme Judicial Court (SJC) denied further appellate review on October 1, 2020.  *Commonwealth v. Dilibero*, 157 N.E.3d 578 (Mass. 2020).  The petitioner timely filed the instant habeas petition on September 15, 2021.  (Dkt. No. 1).

## III. <u>THE HABEAS PETITION</u>

The petitioner alleges that his trial counsel provided ineffective assistance in at least six different ways and thus deprived him of his Sixth Amendment right to the effective assistance of counsel,  Specifically, trial counsel:

(1) failed to move to dismiss the indictment despite the government's use of false testimony and its misleading presentation of statements attributed to witnesses

---

[1] The petitioner's name appears to be misspelled in the MAC's case caption.  The MAC explained that it spelled the petitioner's last name as it was spelled in the indictment.  *Delibero*, 147 N.E.3d at 1127 n.1.  To avoid confusion, this court will use the "Delibero" spelling when citing to the MAC's opinion even though it otherwise adopts the petitioner's apparent preferred spelling of "DiLibero."

before the grand jury, which presented a false and distorted view of the evidence;

(2) failed to alert the court during a pre-trial motion for a hearing on whether the child-victim's memory had been tainted that the prosecutor had misrepresented key facts when arguing the motion; failed to provide an accurate picture of the evidence; and failed to move for reconsideration when the court denied the motion;

(3) failed to renew the taint motion when new evidence became available showing the child-victim had been subjected to additional influences and interviews well-known to corrupt a child's memory;

(4) failed to present available evidence to the jury that the child-victim had been subjected to influences and interviews under circumstances known to corrupt a child's memory or educate the jury on the impacts of improper questioning and vilification;

(5) failed to introduce evidence that, just prior to testifying, the child-victim was coached to identify the petitioner as the perpetrator; and

(6) failed to call available witnesses who would have contradicted key testimony of government witnesses.

(Dkt. No. 5, pp. i-ii).

IV.  **LEGAL STANDARD**

A.  **General Standard of Review for Habeas Claims**

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may only grant habeas relief on claims that have been adjudicated on the merits, and then only after the petitioner has exhausted all available state remedies. 28 U.S.C. § 2254(c); *see O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("state prisoners must give the state courts one full opportunity to resolve any constitutional issues"); *see also Sanchez v. Roden*, 753 F.3d 279, 294 (1st Cir. 2014) (quoting *Casella v. Clemons*, 207 F.3d 18, 20 (1st Cir. 2000)) ("A claim based on federal law is not exhausted unless a petitioner has 'fairly and recognizably' presented it to the state courts."). Under the AEDPA, habeas relief is only permitted if the previous adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the Unites States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).  To obtain relief, then, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

4

*Harrington v. Richter*, 562 U.S. 86, 103 (2011).  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

**B.    Standard of Review for Ineffective Assistance Claims**

To demonstrate ineffective assistance of counsel, a petitioner must show that his representation by counsel (1) "fell below an objective standard of reasonableness" and (2) that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984).  This test creates a high burden for the petitioner to overcome.  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in exercise of reasonable professional judgment."  *Id.* at 689-90; *see also Knight v. Spencer*, 447 F.3d 6, 15 (1st Cir. 2006) (noting that petitioner must show his "counsel's choice was so patently unreasonable that no competent attorney would have made it").

The reasonableness of the attorney's representation is viewed "as of the time of counsel's conduct."  *Strickland*, 466 U.S. at 690.  Judicial scrutiny of counsel's representation and performance must be "highly deferential," and the court should make "every effort . . . to eliminate the distorting effects of hindsight."  *Bell v. Cone*, 535 U.S. 685, 698 (2002) (internal quotation marks omitted).

To demonstrate prejudice, a petitioner must show "that there is a reasonable probability" that, but for the attorney's deficient performance, there would have been a different outcome. *Strickland*, 466 U.S. at 694. A "reasonable probability is one 'sufficient to undermine confidence in the outcome.'" *Johnston v. Mitchell*, 871 F.3d 52, 64 (1st Cir. 2017) (quoting *González-Soberal v. United States*, 244 F.3d 273, 278 (1st Cir. 2001)).

For ineffective assistance claims raised in the habeas context, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable . . . [which] is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Harrington*, 562 U.S. at 101. This review is "doubly deferential," *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)), as "federal courts are to afford 'both the state court and the defense attorney the benefit of the doubt.'" *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (quoting *Burt v. Titlow*, 571 U.S. 12, 15 (2013)). A state court's decision that a petitioner's counsel was not constitutionally ineffective "precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."[2]   *Harrington*, 562 U.S. at 101 (quoting

---

[2] Where, as here, the SJC declined to review the petitioner's claims, this court "can rely upon the 'last reasoned decision issued by the Massachusetts Appeals

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  In other words, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.* at 105.

## V.   DISCUSSION

### 1.   Counsel's Failure to Seek Dismissal of the Indictment

The petitioner's counsel moved prior to trial to dismiss the indictment on the ground that the Commonwealth presented "unfair prejudicial testimony" about the petitioner's irrelevant prior bad acts to the grand jury.  *Delibero*, 147 N.E.3d at 1127, *1.  The petitioner argues that his counsel should have also moved to dismiss on the ground that the Commonwealth presented false and misleading testimony to the grand jury, and that his failure to do so constitutes ineffective assistance.

The relevant facts are as follows.  Detective Brian Cordeiro, the sole investigator on DiLibero's case, testified before the grand jury on January 21, 2015, and among other things summarized his interviews of DiLibero, DiLibero's wife, and the victim's mother, who was also DiLibero's stepdaughter.  (Dkt. No. 5-3, p. 1).  Detective Cordeiro testified that: (1) the victim did not use any particular name to refer to Robert Silvia (Silvia), another of

---

Court' [] in crafting the factual and procedural narrative."  *Strickland v. Goguen*, 3 F.4th 45, 47-48 (1st Cir. 2021) (quoting *Dorisca v. Marchilli*, 941 F.3d 12, 14 (1st Cir. 2019)) (further internal quotation omitted).

his grandfathers,[3] (*id.* at p. 31:3-7); (2) Silvia was unable to walk, (*id.* at p. 22:14-16); (3) Silvia and his wife only watched the victim once every six months, (*id.* at p. 22:16-18); and (4) Silvia and his wife last watched the victim at Christmas (i.e., approximately eight months before the victim first disclosed the abuse to his mother), (*id.*).  The detective also affirmed when asked by the prosecutor that (5) there was a delay of six months between when the abuse occurred and when the victim first reported it.  (*Id.* at p. 32:21-23).  The petitioner contends that these facts clearly mattered to the grand jury since one grand juror asked Detective Cordeiro what the victim called Silvia and another remarked on the interval between the abuse and the victim's initial disclosure of the abuse.  (*Id.* at pp. 31:3-4, 33:16-18).

Testimony at trial contradicted some of Detective Cordeiro's grand jury assertions, however.  The victim's mother and Silvia testified that (1) the victim referred to Silvia as "Papa Bob," and his mother had recently attempted to have the victim call Silvia simply "Papa," (Dkt. No. 20-6, pp. 106:19-107:4); (2) Silvia could walk with difficulty, (*id.* at p. 131:8-22); (3) Silvia and his wife watched the victim "[m]aybe once a month, twice a month," (*id.* at p. 147:15-23); and (4) Silvia was last with the victim

---

[3] The record reveals three individuals who were in some sense a grandfather to the victim.  DiLibero is married to the victim's maternal grandmother and is thus a stepfather to the victim's mother.  Robert Silvia is the father of the victim's stepfather.  Mark Raffa is the father of the victim's biological father, and thus the victim's biological paternal grandfather.

about a week before the initial disclosure, (*id.* at p. 114:16-21).
The victim's mother testified that, (5) even at the time of trial,
she did not know when the abuse happened.  (*Id.* at p. 135:12-19).
Significantly, the victim's mother also testified that she told
Detective Cordeiro that she was trying to have the victim call
Silvia "Papa" instead of "Papa Bob."  (*Id.* at pp. 106:22-107:22).
She similarly denied ever telling anyone that Silvia could not
walk.  (*Id.* at p. 131:20-22).

Before the MAC, the petitioner, reasoning that Detective
Cordeiro necessarily must have presented false testimony to the
grand jury, argued that the false testimony provided a basis to
seek dismissal of the indictment and his trial counsel thus
provided ineffective assistance in failing to do so.  The MAC,
noting that the petitioner had waived this argument where he never
raised it before his motion for a new trial, considered "whether
any presentation of false testimony created a substantial risk of
a miscarriage of justice."  The MAC found that it did not.  The
MAC found that the petitioner "ha[d] not met his burden of showing
that the Commonwealth knowingly or recklessly presented any false
testimony to the grand jury, let alone that any errors in
Cordeiro's testimony 'probably influenced the grand jury's
determination' to indict."  *Id.* (quoting *Commonwealth v. Mayfield*,
500 N.E.2d 774, 778 (Mass. 1986)).  As to the petitioner's related
ineffective assistance claim, the MAC repeated that "any

presentation of false testimony did not create a substantial risk of miscarriage of justice." *Id.* at 1127, *9. Because, the MAC explained, the substantial risk of a miscarriage of justice test is substantively the same as the prejudice prong of the test for ineffective assistance of counsel, the lack of any such risk disposed of the ineffective assistance claim. *Id.* (citing *Commonwealth v. Peloquin*, 770 N.E.2d 440, 445 n.4 (Mass. 2002)); *see also Strickland*, 466 U.S. at 697 (court need not "address both components of the [ineffective assistance] inquiry if the defendant makes an insufficient showing on one").

The court discerns no error in the MAC's determination that trial counsel's failure to seek dismissal on this ground did not prejudice the petitioner under *Strickland.* The petitioner takes issue with the MAC's finding that he "[did] not [meet] his burden of showing that the Commonwealth knowingly or recklessly presented any false testimony to the grand jury," contending that "overwhelming evidence in the record" compels the contrary conclusion. (Dkt. No. 5, p. 28). In this court's view, though, the evidence presented is far from overwhelming. Much of it consists simply of noting inconsistencies between Detective Cordeiro's grand jury testimony on the one hand and testimony from the subsequent evidentiary hearings and trial on the other. Even accepting that these inconsistencies existed, the Commonwealth explained in its brief to the MAC, which the MAC incorporated into

its own opinion, *Delibero*, 147 N.E.3d at 1127, *1, that these inconsistencies were at least as consistent with unintentional errors as they were with deliberate misrepresentations.

More to the point, the MAC's ruling that trial counsel was not deficient in failing to seek dismissal was not based on its finding that the Commonwealth did not present false testimony.  On the contrary, the MAC considered the possibility that false testimony was provided but found that "any presentation of false testimony did not create a substantial risk of a miscarriage of justice." *Delibero*, 147 N.E.3d at 1127, *9.  "A substantial risk of a miscarriage of justice exists when [the court has] 'a serious doubt whether the result of the [proceeding] might have been different had the error not been made.'" *Commonwealth v. Randolph*, 780 N.E.2d 58, 66-67 (Mass. 2002) (quoting *Commonwealth v. LeFave*, 714 N.E.2d 805, 809 (Mass. 1999)).  Here, the MAC in essence found that there was no serious doubt about whether the grand jury would have failed to indict the petitioner if it had not heard the alleged false testimony; it likely would have indicted even without the allegedly false testimony.

The petitioner points to what he considers countervailing evidence, but none of it is sufficient to call the reasonableness of the MAC's decision into question.  Specifically, the petitioner identifies two grand juror questions which, he contends, show that Detective Cordeiro's (allegedly false) grand jury testimony likely

affected the grand jury's charging consideration. In the first instance, a grand juror "perceptively asked" Detective Cordeiro what the victim called Silvia. (Dkt. No. 5, p. 29). The petitioner infers from this question that the grand juror had identified Silvia as another "Papa," and thus another possible suspect. The petitioner argues that Detective Cordeiro's response, that the victim did not call Silvia anything, combined with other inaccuracies about the extent of Silvia's disability and the last time Silvia saw the victim, acted to assuage any doubts that the grand jury might have had and/or should have had about whether the victim initially identified Silvia as his abuser rather than DiLibero.

The court does not find this argument persuasive. Detective Cordeiro, earlier in his testimony, explained twice that, at the time of the victim's disclosure of the abuse, the victim's mother had been trying to get the victim to refer to Silvia as "Papa" but the victim was not yet doing so. (Dkt. No. 5-3, pp. 5:8-11, 7:7-10). Even if the grand jury had also heard that the victim regularly called Silvia "Papa Bob," there is no evidence that it would have concluded that the victim's disclosure about "Papa" (not "Papa Bob") referred to Silvia instead of DiLibero. There is likewise no evidence that the grand jury relied on Detective Cordeiro's testimony that Silvia could not walk at all (as opposed to walking with difficulty) or that Silvia had not seen the victim

12

recently in determining that there was probable cause to charge DiLibero with the crime.

The petitioner also points to an instance where a grand juror asked Detective Cordeiro whether there had been "any type of forensic evidence or examination." (Dkt. No. 5-3, p. 32:3-4). Detective Cordeiro explained that forensic examinations are only fruitful when they are performed within 72 to 100 hours of an assault, and that there was likely no examination because the victim's initial disclosure was likely outside of that window. Immediately following that statement, the prosecutor elicited from Detective Cordeiro that "there was a delay of six months before there was a disclosure," (*id.* at p. 32:21-23), even though the detective had already truthfully testified that no one knew when the assault took place. (*Id.* at p. 32:11-12). According to the petitioner, the grand juror's comment following this testimony -- "I guess I didn't realize the timeframe, you know, in terms of when the assault was. I know we had a year" -- made it clear that the timing of the assault was a significant factor in the grand jury's deliberations. (Dkt. No. 55-3, p. 33:16-18). The petitioner argues that the prosecutor, by eliciting this testimony, avoided any possibility that the grand jury might have decided not to indict the petitioner because the Commonwealth could not show when the abuse happened.

This argument too has no force.  The exact timing of the abuse was of no legal importance because the Commonwealth did not need to allege, and the grand jury did not need to find, that the assault happened within a certain timeframe to secure an indictment.  M.G.L. c. 277, § 20 ("The time . . . of the commission of the crime need not be alleged unless it is an essential element thereof."); M.G.L. c. 265, § 23 (establishing elements of rape and abuse of a child as (1) having sexual intercourse (2) with a child under 16 years of age).  The petitioner concedes that the grand jury properly could have indicted him without hearing any evidence about when the assault happened but simply asserts without support that the grand jury might have nonetheless declined to indict without some sense of when it occurred.  This speculative claim falls far short of justifying dismissal of a facially valid indictment.  See Mayfield, 500 N.E.2d at 778-79 ("The defendant must . . . show probable prejudice in the grand jury proceedings.").

Moreover, the petitioner's argument ignores the fact that other parts of Detective Cordeiro's testimony, to which he does not object, provided evidence that the assault happened within a year of the disclosure.  The initial disclosure took place on August 11, 2014.  Detective Cordeiro testified that, according to the victim's mother, the last time the victim spent the night at DiLibero's residence was July 4, 2014.  (Dkt. No. 5-3, p. 6:7-8).

14

He also testified that he learned about an instance when the victim slept over at the home alone with DiLibero while DiLibero's wife and daughter were visiting family in Virginia.  The victim's mother reportedly believed that this happened the previous February or April (both in 2014), (*id.* at p. 25:1-5), while DiLibero's wife said that it was in August of 2013.  (*Id.* at p. 29:1-6).  Based on that testimony, the grand jury could have reasonably concluded that the assault happened in either August 2013, February 2014, April 2014, or July 2014.  Each of these dates was between a month and a year before the disclosure, and all except August 2013 were within six months of the disclosure, as the prosecutor suggested to Detective Cordeiro.  The grand jury thus could have found that the assault took place within a year of the disclosure even without the allegedly false testimony.

In sum, the court finds that the MAC acted reasonably and did not err in determining that any alleged false testimony before the grand jury did not pose a substantial risk of altering the outcome of the vote to indict.  Because the grand jury likely would have indicted even had the evidence not been presented, the petitioner's trial counsel was not deficient in failing to move to dismiss the indictment, and the petitioner similarly was not prejudiced by his failure to do so.  Accordingly, the petitioner is not entitled to relief on this claim.

**2.   Counsel's Failure to Alert the Trial Court to the Prosecutor's Misrepresentations**

Before trial, the petitioner's counsel moved for an evidentiary hearing to determine whether the victim's testimony had been tainted (the "taint motion").   The trial court subsequently convened a hearing on the taint motion.   During the hearing the prosecutor made certain statements, which the Commonwealth later acknowledged were erroneous, about the circumstances under which the victim first disclosed the abuse to his mother.   The petitioner contends that the trial court clearly adopted and relied on these statements, and thus his counsel was deficient in failing to alert the court to witness statements to the contrary and to "present other relevant facts that would have helped to correct the false narrative [the prosecutor] presented." (Dkt. No. 5, p. 41).

The relevant facts are as follows.   The petitioner's trial counsel pointed out during the hearing that the victim first mentioned the abuse immediately after speaking to Silvia, whom his mother was encouraging him to call "Papa," on the telephone.   (Dkt. No. 20-1, pp. 6:21-7:2).   The prosecutor immediately interjected and stated that the victim never spoke to Silvia on the phone that day.   (*Id.* at p. 7:3-6).   According to the prosecutor, the reason why the abuse "came out" is that the victim's mother asked the victim why he refused to speak with Silvia and the victim responded

by saying that "Papa" put his penis in the victim's mouth.  (*Id.* at p. 7:6-9).  The prosecutor also repeated these facts in her written opposition to the petitioner's "taint" motion.  (Dkt. No. 5-1, p. A.52).  As the Commonwealth later acknowledged, though, the prosecutor's statements were incorrect; the victim did not refuse to speak to Silvia and was not upset.  *See Delibero*, 147 N.E.3d at 1127, *5 ("the Commonwealth now concedes [the prosecutor's statements] were incorrect").  The prosecutor knew or should have known that her statements were incorrect because she previously heard Detective Cordeiro testify to the grand jury that the victim did take the phone to wish Silvia a happy birthday and only made the disclosure after speaking to Silvia.  (Dkt. No. 5-3, p. 23:7-20).  Rather than being upset, the detective testified, the victim "was jumping on the bed like it was a game or funny as he described the incident."  (*Id.* at p. 5:21-22).

The trial court denied the petitioner's motion for a taint hearing.  In its ruling, the trial court twice mentioned the erroneous fact that the victim refused to speak on the phone and erroneously stated that the victim was jumping on the bed before being asked to speak on the phone.  (Dkt. No. 5-1, pp. A.55, A.58).

On appeal, the petitioner argued that his counsel was deficient in failing to move for reconsideration of the court's denial of his motion for an evidentiary hearing.  The MAC rejected this argument.  The MAC found that "a motion for reconsideration

calling attention to the Commonwealth's mistaken representations would have been unlikely to succeed." *Delibero*, 147 N.E.3d at 1127, *5. In so finding, the MAC pointed out that the focus of the taint motion was not on the initial disclosure, but rather on "whether[, after the disclosure,] the SAIN interviewer . . . used techniques that might have tainted [the victim's] memory."[4] *Id.* The MAC found that, although the trial court recited incorrect information it had received from the prosecutor, it recited this information only "as background that had no bearing on the issue presented." *Id.* As such, none of the erroneous facts that the trial court recited, or that trial counsel failed to marshal and raise via a motion for reconsideration, were material to the taint motion, which was, again, "focused on the SAIN interviewer's techniques." *Id.* Accordingly, the result would not have been any different had counsel raised those facts and sought a new hearing. In that regard, the MAC separately concluded after reviewing the transcript of the SAIN interview "that there was no evidence of coercion, suggestion, or coaching of [the victim's] testimony deserving consideration of a taint hearing procedure." *Id.* at 1127, *3 (internal quotation omitted).

---

[4] A SAIN (Sexual Assault Intervention Network) interview is a one-on-one interview between a child abuse victim and a child interview specialist. *See S.A.I.N FAQ* (sic), Northwestern District Attorney, https://www.northwesternda.org/prosecution/child-abuse/pages/sain-faq (last visited Mar. 17, 2023).

The MAC did not err in its treatment of this issue.  As it noted, the inaccuracy of the prosecutor's statements regarding how the victim came to report the abuse were immaterial to the narrow issue before the trial court, which was limited to considering whether there was substantial evidence to suggest that the *interview* of the victim "tainted" the victim's testimony.  *See* (Dkt. No. 5-1, p. A.56) ("The interview is the subject of Dilibero's instant motion. . . . Dilibero argues that [the interviewer's] suggestive questioning techniques 'tainted' the victim's testimony concerning Dilibero's alleged sexual abuse."). Aside from one error about the circumstances of the victim's initial disclosure – that he disclosed the abuse after refusing to speak to "Papa" on the phone when he in fact disclosed the abuse after speaking to Silvia –- all of the factual findings in the order's "Discussion" section are about the interview itself as captured by the video recording.  *See* (*id.* at pp. A.58-A.60).  As for that one error, its stated significance was that the victim made the initial disclosure "spontaneously, rather than in response to questioning," which was ultimately correct.  (*Id.* at p. A.58).  As such, the petitioner's erroneous statements during the hearing demonstrably provided no viable basis to seek to renew the motion for a hearing.

Undeterred, the petitioner contends that the prosecutor's misstatements nonetheless mattered because they (somehow) led the

trial court to "view DiLibero as the only possible suspect, undermining any concern that [the victim's] memory could have been tainted to improperly focus on DiLibero." (Dkt. No. 5, p. 42). This contention too misses the mark. To the extent the petitioner argues that evidence that was not presented might have shown that the victim was likely referring to Silvia when he disclosed the abuse, the evidence would have had no bearing on whether the interviewer's techniques tainted the victim's memory. Similarly, the petitioner has not shown (and cannot show) that the trial court's purported adoption of the prosecutor's misrepresentations in turn influenced the court's analysis of the interviewer's techniques.

In short, even accepting the trial court was presented with some factually incorrect information, there is no basis to believe the information affected the court's analysis or would have changed the outcome of the hearing. It follows that trial counsel's failure to move for a new hearing based on the immaterial information was not deficient, nor did it prejudice the petitioner.

### 3. Counsel's Failure to Renew the Taint Motion

In a somewhat related claim, the petitioner argues that trial counsel was also deficient in failing to renew the taint motion after subsequent pretrial testimony and other evidence revealed that the victim "had been subjected to influences known to corrupt a child's memory." (Dkt. No. 5, p. 47). The petitioner identifies

four categories of evidence that would have justified a taint hearing.[5]  The first is the victim's testimony at a pretrial competency hearing, during which the victim made unsolicited remarks about "tell[ing] a bad thing about" DiLibero, about DiLibero lying, and about the "disgusting thing" about DiLibero. (Dkt. No. 20-2, pp. 14:14, 21:15-17, 22:6-19, 27:5-6).  The second is the victim's alleged statement to his aunt (the petitioner's daughter) that he was not allowed to come over for a sleepover "[b]ecause my dad told me Papa did mean things to me."  (Dkt. No. 5-4, ¶ 3); (Dkt. No. 5-1, p. A.106, ¶ 43).  The third category of evidence is the victim's mother's pretrial testimony, given during a hearing on a motion to suppress an identification, about her post-SAIN interview conversation with the victim in which she asked the victim which Papa abused him.  (Dkt. No. 20-3, pp. 25:16-31:8).  The fourth category is the victim disclosing, for the first time, that the abuse happened more than once during a one-on-one interview with the prosecutor.  *See* (Dkt. No. 20-4, pp. 9:9-10:14).

The MAC devoted a substantial portion of its opinion to the alleged failure to renew the taint motion.  *See Delibero*, 147 N.E.3d at 1127, *5-*6.  In reflecting on each of the four presented

---

[5] As best the court can glean from the record, each of the four categories consists of events that occurred or were revealed to the petitioner between September 8, 2015, when the trial court denied the petitioner's taint motion, and October 4, 2016, when his trial began.  For example, the first category arises out of the victim's testimony at a competency hearing on March 11, 2016. *See* (Dkt. No. 20-2).

categories, the MAC found that the petitioner was not prejudiced, because the evidence would not have entitled him to a taint hearing, meaning that his trial counsel "thus was not ineffective in failing to seek such a hearing." *Id.* at 1127, *6. The MAC's findings on each of these four categories, and the petitioner's objections to those findings, are discussed in detail below.

    a.   *The Victim's Pretrial Testimony*

Regarding the first category of evidence, reflecting negative comments the victim made regarding the petitioner, the MAC declined to "reason backwards" from the victim's comments to conclude that someone therefore must have vilified the petitioner to the victim, and thus tainted his testimony. *Delibero*, 147 N.E.3d at 1127, *5. The MAC particularly noted that the petitioner could not or did not (1) identify what was said to the victim to allegedly vilify the petitioner; (2) show that supposed vilifying statements were "said in a context comparable to an investigative interview"; or (3) provide any expert evidence or citations to "a substantial body of scholarly articles" to support his reasoning. *Id.*

The petitioner makes three objections to this ruling. First, he takes aim at the MAC's remark that "the defendant cannot identify what was said to [the victim]," *id.*, contending that this was clearly erroneous based on the victim's alleged statement to his aunt about his father telling him that "Papa did mean things to [him]," *id.* at 1127, *6 (alteration in original). As discussed

below in Section V.3.b, the MAC properly relied on the trial court's assessment that the affidavits describing this statement were not credible.

The petitioner likewise objects to the MAC's ruling insofar as the MAC required the petitioner to show that the vilification happened in "a context comparable to an investigative interview." *Id.* at 1127, *5. The petitioner contends that nothing in the state cases the MAC cited limits vilification to investigative interviews, arguing further that those cases "specifically note the particular danger of the influence a parent can have on a child's memory outside of an investigative interview." (Dkt. No. 5, p. 57). But even assuming that this is a correct reading of the cited cases, the argument does not detract from the MAC's main point: the victim's testimony by itself was insufficient to show that someone had vilified DiLibero to him. Further, to the extent the petitioner argues that the MAC misapplied state law, that claim is not cognizable on habeas review. *See Estelle*, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state law questions.").

The petitioner also objects to the MAC's comment that the petitioner failed to provide expert evidence or scholarly articles, arguing that such evidence was unnecessary because *State v. Michaels*, 642 A.2d 1372 (N.J. 1994), which both the trial court and MAC cited, already establishes through a scholarly analysis

that vilification can taint a child victim's memory.  This argument misses the point.  The MAC did not reject the premise that vilification can distort a victim's memory; rather, it ruled that it could not infer that vilification *occurred* in this case based on the victim's testimony alone, in the absence of some expert evidence or scholarly articles to that effect.  This was not an unreasonable decision and the petitioner's argument does not meaningfully call it into question.

      b.   *The Petitioner's Family's Affidavits*

Regarding the second category, the MAC found that the trial court acted within its discretion when it declined to credit affidavits from the petitioner, his wife, and his daughter purporting to describe a remark the victim made to the petitioner's daughter about how the victim's father told the victim that "Papa did mean things to [him]."  *Id.* at 1127, *6 (alteration in original).  The petitioner contends that the MAC's decision was unreasonable because the trial court abused its discretion by finding the affidavits incredible without giving the affiants an opportunity to testify, even though the government did not specifically refute the contents of the affidavits.

The court finds no basis to question the state courts' treatment of this issue.  The trial court, being the court closest to the facts, enjoys broad discretion to make credibility determinations, and it acts well within that discretion when it

declines to credit self-serving affidavits from a criminal defendant and his close relatives. *See Forsyth v. Spencer*, 595 F.3d 81, 84-85 (1st Cir. 2010) (accepting state trial court's decision to credit plea counsel's affidavit and not to credit defendant's affidavit); *Commonwealth v. Glacken*, 883 N.E.2d 1228, 1234 (Mass. 2008) ("The judge . . . acted well within his discretion when he chose not to credit the defendant's affidavit."). It follows that the MAC's decision not to disturb the trial court's determination was not error. *Cf. Norton v. Spencer*, 351 F.3d 1, 7 (1st Cir. 2003) (appellate court's finding "that the trial judge viewed the affiants as incredible" was unreasonable when the trial judge made no explicit finding about affidavits).

c. *The Victim's Mother's Pretrial Testimony*

Third, the MAC "carefully reviewed" the victim's mother's pretrial testimony about her post-SAIN interview conversation with the victim about which "Papa" it was that abused him. *Delibero*, 147 N.E.3d at 1127, *6. After reviewing the testimony and considering it "in light of the indicia of improper interviewing techniques discussed in *Michaels* and *Allen*, as well as the passage the defendant cites from *Commonwealth v. LeFave*," the MAC determined that the testimony did not raise any concerns serious enough to warrant an evidentiary hearing. *Id.* (emphasis altered from underlining to italics).

The petitioner faults the MAC for not specifically applying the factors the trial court relied on in denying the initial request for an evidentiary hearing.  But given that the trial court explicitly adopted these factors from *Michaels* and *Allen*, *see* (Dkt. No. 5-1, pp. A.56-A.59), and that the MAC explicitly considered the mother's testimony in light of those cases, there is no discrepancy here.

   d. *The Prosecutor's One-on-One Interview*

Finally, the MAC took a slightly different approach regarding the fourth category of evidence.  Rather than deciding that the circumstances of the prosecutor's interview of the victim would not warrant a taint hearing, the MAC found that any taint motion based on this evidence would at best have only resulted in the suppression of any new statements that came out of the interview, namely that the abuse happened more than once.  The MAC then found that allowing the victim to testify that the abuse happened more than once did not prejudice the petitioner because it did not deprive him of a substantial ground of defense.

Unsatisfied, the petitioner argues that the MAC erred because it ignored the fact that, after the interview, the victim "was somehow able to 'remember' details of now multiple incidents that [he] never reported during his recorded SAIN interview."  (Dkt. No. 5, p. 56).  It is worth considering what exactly these details were.  In the email the prosecutor sent to the petitioner's trial

counsel to notify him of the victim's new statement, shortly after the interview, the statement was described thus:

> When I last saw [the victim] he still maintained that Papa put his Pee-pee in his mouth but says this happened more than 1x. He says it happened in the bathroom and in the living room on the couch. *He does not have a lot of memories about details* but he has been consistent about the allegation.

(Dkt. No. 55-1, p. A.85) (emphasis added). The only additional details the victim reportedly remembered after the interview were that the abuse happened in the bathroom and in the living room on the couch. The petitioner fails to explain how or why the MAC's silence as to these details renders its findings unreasonable or how those details should have changed the analysis, nor is any such explanation clear to this court. In any case, this court finds that the MAC's ruling was reasonable.

In sum, the MAC did not err in considering these issues. None of the evidence now raised would have entitled the petitioner to a taint hearing. Therefore, the petitioner's counsel did not perform deficiently in failing to rely on them to renew the taint motion, nor did this "failure" prejudice the defendant. The petitioner is not entitled to relief on this claim.

### 4. Failure to Present "Taint" Evidence at Trial

In his fourth claim, the petitioner, focusing once more on the taint motion, argues that his trial counsel was deficient in failing to present evidence at trial that the victim's testimony

had been tainted after the SAIN interview. This is the same evidence at issue in the petitioner's third claim, namely: (1) the victim's negative remarks about DiLibero in his pretrial testimony; (2) the victim's alleged statement about why he was not allowed to sleep over at DiLibero's house; (3) the victim's mother's questioning of the victim; and (4) the prosecutor's private interview with the victim. The MAC held that this "failure" to present evidence did not prejudice the petitioner because none of the evidence would have changed the outcome of the case. In so ruling, the MAC relied on its earlier analysis regarding counsel's alleged failure to renew the taint motion after it was denied, in which the MAC concluded that the evidence was insufficient to warrant a new hearing, but also went further to point out that (1) the petitioner presented "no expert affidavit suggesting that 'vilification' could be inferred" from the victim's statements; (2) the petitioner would not have "accomplished anything material for the defense" if he further explored the circumstances of the victim's mother's questioning of the victim; and (3) eliciting testimony about the circumstances of the victim's first disclosure that the abuse happened more than once "would have drawn substantial jury attention to this point," which would have more likely harmed than helped the petitioner. *Delibero*, 147 N.E.3d at 1127, *6.

Although the petitioner contends otherwise, trial counsel's efforts to counter the victim's testimony did not rise (or rather sink) to the level of deficient performance.  Trial counsel's strategy was to establish that the victim referred to other people as "Papa," and was likely referring to someone other than the petitioner when he first disclosed the abuse, but was subsequently influenced to identify the petitioner as his abuser.  As to the first point, counsel elicited from the victim that he also called his "dad's dad" "Papa."  (Dkt. No. 20-6, p. 51:17-20).  He also elicited from the victim's mother that, at the time of the initial disclosure, she was trying to get the victim to refer to Robert Silvia as "Papa" rather than "Papa Bob" and that the victim called Silvia "Papa" when he spoke to him on the phone just before the disclosure.  (*Id.* at pp. 107:2-4, 112:10-12).  He also elicited from Detective Cordeiro that the petitioner informed the detective during his interview that the victim referred to other people as "Papa."  (Dkt. No. 20-7, p. 75:21-25).  Finally, he elicited from Mark Raffa that the victim "could have" called him "Papa," (Dkt. No. 20-8, p. 21:4-5), and from his investigator that Raffa had previously affirmed that the victim did call him "Papa," (*id.* at p. 30:9-21).  Likewise, counsel emphasized in his closing that the victim made the initial disclosure immediately after speaking to Silvia on the phone, not DiLibero.  (Dkt. No. 20-9, p. 10:5-10).

Trial counsel was no less zealous in presenting evidence that the subsequent investigation was improperly colored against his client.  He elicited from the victim's mother that, at the time of the initial disclosure, she did not ask the victim which "Papa" had abused him but simply assumed and reported that he was referring to DiLibero.  (Dkt. No. 20-6, pp. 116:11-16, 128:20-129:21:3, 133:6-12).  He also elicited from Detective Cordeiro that the detective never investigated either of the victim's other "Papas."  (Dkt. No. 20-7, pp. 78:22-79:23).  He also played a recording of the SAIN interview for the jury, in which the victim made clearly incorrect and incredible claims about, *inter alia*, having siblings.  (*Id.* at p. 85:6-25).  Significantly, counsel also presented expert testimony about deficiencies in the interview and how those deficiencies could have altered the victim's memory and account.  (Dkt. No. 20-8, pp. 77:18-91:16).  Counsel further stressed these points in his closing and complemented them with an argument about the suggestiveness of the informal photo array the victim's mother conducted.  (Dkt. No. 20-9, pp. 10:22-11:3, 12:22-13:6, 15:5-16, 16:20-17:19, 18:24-19:6).

Notwithstanding this vigorous trial defense, the petitioner makes a substantial but ultimately futile effort to paint his counsel's performance as deficient.  He cites to several child sexual abuse cases from the Second, Seventh, and Eleventh Circuits, as well as one case from the MAC, where trial counsel's performance

was found to be deficient for failing to challenge a witness' credibility with expert evidence or otherwise. *See* (Dkt. No. 5, pp. 66-67, 69) (collecting cases). Even assuming that each of these nonbinding cited cases was soundly reasoned, however, they are readily distinguishable from the instant case because their failures were far more egregious than those claimed here.

Here, the petitioner takes issue with his trial counsel's failure to introduce certain evidence to challenge the victim's credibility, notwithstanding the fact that counsel attacked the victim's account in other ways. In several of the cited cases, however, the court faulted trial counsel for more fundamental failures, such as not consulting with or presenting a medical or psychological expert who could evaluate or challenge the prosecution's medical or psychological evidence, or even not interviewing any witnesses or otherwise preparing a defense. *See Gersten v. Senkowski*, 426 F.3d 588, 607-08, 611 (2d Cir. 2005) (failure to investigate and challenge physical evidence and government's expert psychological witness); *Eze v. Senkowski*, 321 F.3d 110, 127-28 (2d Cir. 2003) (failure to consult medical expert or impeach grounds of government's expert medical witness' conclusion); *Pavel v. Hollins*, 261 F.3d 210, 223 (2d Cir. 2001) (failure to challenge physical evidence); *Lindstadt v. Keane*, 239 F.3d 191, 201 (2d Cir. 2001) (failure to consult medical expert or seek report on which government's expert medical witness relied);

*Commonwealth v. Baran*, 905 N.E.2d 1122, 1141 (Mass. App. Ct. 2009) (failure to meaningfully challenge government's expert witnesses); *cf. Holsomback v. White*, 133 F.3d 1382, 1385 (11th Cir. 1998) (failure to inquire into significance of lack of medical evidence of abuse); *Pavel*, 261 F.3d at 216 (counsel prepared no defense, instead trusting court would grant motion to dismiss after government's case-in-chief); *Williams v. Washington*, 59 F.3d 673, 681 (7th Cir. 1995) (counsel conducted no investigation or witness interviews other than speaking with his clients).[6]

None of these scenarios are akin to the petitioner's trial. In the petitioner's case, the prosecution offered no physical evidence or expert testimony.[7]  In fact, the only expert witness, an expert in forensic and school-age psychology, testified on the petitioner's behalf.  *See* (Dkt. No. 20-8, p. 40:10-12).  This expert was one of three witnesses the petitioner's counsel called, with another being his own investigator.  There is no suggestion that the petitioner's trial counsel failed to conduct any

---

[6] Some of the cited cases include other varieties of seriously deficient performance also not at issue here.  *See, e.g.*, *Eze*, 321 F.3d at 134 (counsel failed to object to improper impeachment regarding defendant's withdrawn citizenship application); *Lindstadt*, 239 F.3d at 202 (counsel indicated in his opening statement that his client would only testify "if [the prosecutors] *have made their case*") (emphasis in original); *Williams*, 59 F.3d at 680 (counsel failed to review letter produced to him in discovery).

[7] At the close of its case-in-chief, the prosecution did submit certain medical records of the victim generated as part of the SAIN investigation.  (Dkt. No. 20-7, p. 105:5).  Although these medical records are not included in the record before this court, it appears that they did not contain any evidence of abuse or any affirmative evidence that there was no abuse.  *See* (Dkt. No. 20-4, p. 31:14-16).

investigation or prepare a defense, nor is any such failure apparent from the record. As such, trial counsel did not commit either of the sins at issue in the cited cases.

To be sure, another defense attorney handling the petitioner's case might have chosen to press the taint issues as the petitioner now frames them, but that by itself does not mean that trial counsel performed deficiently in pursuing a different and apparently reasonable trial strategy. Considering the significant helpful evidence that counsel was able to elicit at trial, particularly in light of *Strickland*'s strong presumption of competence, it would be strong medicine indeed to say that the petitioner's defense was constitutionally infirm. The MAC did not find it necessary to disturb the petitioner's conviction on this basis, and this court sees no reason to disagree.

### 5. **Failure to Present Evidence of Victim-Witness Coaching**

The petitioner argues that trial counsel provided ineffective assistance by failing to present evidence to the jury that someone coached the victim on how to identify the petitioner just before he testified. The petitioner describes this alleged coaching as follows. Shortly before the victim was to testify, DiLibero, his counsel, his mother, and his wife's friend were all exiting the courtroom. (Dkt. No. 5, p. 77). As they exited, they heard voices from a nearby anteroom, including voices that DiLibero recognized as belonging to the victim and to a victim-advocate. (*Id.*).

DiLibero then heard a third voice say, "[Victim], remember it's the man in the brown jacket." (*Id.*).  DiLibero was wearing a white shirt and a brown jacket.  (*Id.*).  This third voice allegedly belonged to the victim's maternal great aunt, who held a strong bias against DiLibero.  (*Id.*).  After the group emerged into the hallway and joined up with DiLibero's wife, DiLibero asked his counsel what he was going to do about this alleged coaching.  (*Id.* at p. 78).  His counsel responded, "Nothing.  It's hearsay. . . . let's just concentrate on the trial that's [about] to start." (*Id.*) (ellipsis in original).  DiLibero, his mother, and his wife's friend all submitted affidavits attesting to overhearing the alleged coaching.[8]  (Dkt. No. 5-1, pp. A.101-A.102, A.108-A.109). DiLibero, his mother, and his wife attested to the conversation between DiLibero and his counsel in the hallway.[9]  (*Id.* at pp. A.102, A.107, A.109).

In ruling on the petitioner's post-trial motion for an evidentiary hearing, the trial court declined to credit these affidavits.  (*Id.* at p. A.131).  The court noted (but did not explicitly credit) an affidavit from the victim-advocate, in which

---

[8] It bears mentioning that there are inconsistencies between the three affidavits in terms of the exact phrase used to allegedly coach the victim.  *Compare* (Dkt. No. 5-1, p. A.102, ¶ 41) ("[Victim], remember it's the man in the brown jacket.") *with* (*id.* at p. A.108, ¶ 6) ("remember the brown jacket.") *and* (*id.* at p. A. 109, ¶ 5) ("remember to point to the man in the brown jacket").

[9] Trial counsel, for his part, claimed not to recall this conversation, but said that if he had been informed of the alleged coaching, he would have confronted whoever was responsible.  (Dkt. No. 5-1, p. A.95, ¶ 22).  However, he never submitted an affidavit to that effect.  (*Id.* at p. A.96, ¶ 27).

she stated that she did not remember any such coaching but that she would have stopped it if it had happened in her presence. (*Id.*).    As previously discussed, the trial court had broad discretion to make these credibility determinations under both federal and Massachusetts law.  *See Forsyth*, 595 F.3d at 84-85; *Glacken*, 883 N.E.2d at 1234.   The trial court further pointed out that the victim's identification testimony "went well beyond simply describing brown clothing worn by the defendant . . . [as the victim] went into great detail about who 'Papa' is and who he lives with." (Dkt. No. 5-1, pp. A.131-A.132).   On appeal, the MAC affirmed the trial court's ruling, noting that the petitioner "ha[d] not shown any error or abuse of discretion in the judge's decision." *Delibero*, 147 N.E. at 1127, *7.

Now, on his third attempt to make something of the coaching allegations, the petitioner argues that the trial court acted unreasonably in both discrediting the affidavits and finding that any evidence of coaching would not have meaningfully impacted the victim's identification testimony.   He further argues, by extension, that the MAC acted unreasonably in upholding the trial court's rationale.   The court disagrees.

The petitioner faults the trial court for finding that the four affidavits were "self-serving," contending that "[o]nly DiLibero's own affidavit could conceivably be called self-serving." (Dkt. No. 5, pp. 80-81).   The first problem with this

assertion is that the trial court did not describe the affidavits as "self-serving" in considering this issue, although it did cite to Massachusetts cases so describing affidavits from a defendant and a defendant's wife.  (Dkt. No. 5-1, p. A.131) (citing *Commonwealth v. Scoggins*, 789 N.E.2d 1080, 1085 (Mass. 2003) and *Commonwealth v. Savage*, 746 N.E.2d 1029, 1035 (Mass. App. Ct. 2001)).  Second, the petitioner takes a pedantically narrow view of the term "self-serving."  It is clear from the record that the petitioner's wife, his wife's friend, and his mother were all present at the courthouse to support the petitioner.  Because of their relationships to the petitioner, each had an interest in seeing the petitioner acquitted.  In that sense, their affidavits were unquestionably "self-serving" insofar as their coaching allegations aligned with the affiants' interests in seeing DiLibero go free, or at least win a second chance at an acquittal. It was not unreasonable for the trial court to discredit the affidavits on that basis.

The petitioner's arguments about prejudice are likewise unconvincing.  There is no dispute that the victim was intimately familiar with the petitioner.  In his testimony, the victim articulated that the petitioner lived with his wife, daughter, and dog in Fall River, MA.  (Dkt. No. 20-6, pp. 34:12-35:21).  The petitioner argues that, "had the jurors learned [the victim] had been coached in this manner, they would have understood that [the

victim] could simply have recognized DiLibero (whom he was coached to identify) as also being the person who lived with [DiLibero's daughter]." (Dkt. No. 5, p. 80). This seems particularly unlikely given that the victim first testified about DiLibero's daughter (the victim's maternal aunt) and then identified DiLibero as living with said daughter. *See* (Dkt. No. 20-6, pp. 34:12-35:19). Nonetheless, the petitioner goes further to argue that the coaching evidence would have raised concerns among the jurors about the reliability of any of the victim's identification testimony, and indeed about the possibility of improper suggestions influencing the victim's entire testimony. (Dkt. No. 5, p. 80). But these arguments are little more than conclusory speculation, especially considering that there was never any real doubt that the victim could identify the petitioner as "Papa." In any case, they fall far short on habeas review of demonstrating *Strickland* error. *See* *Cullen*, 563 U.S. at 190 (habeas review on ineffective assistance is "doubly deferential").

### 6.   **Failure to Call the Petitioner and His Wife as Witnesses**

Finally, the petitioner argues that his trial counsel was ineffective in not calling the petitioner and his wife as witnesses at trial. The petitioner claims that he and his wife would have provided testimony crucial to his defense, most notably that the victim referred to both Mark Raffa and Robert Silvia as "Papa." Both attested to their desire to testify in the affidavits they

submitted in connection with the petitioner's motion for a new trial. *See* (Dkt. No. 5-1, pp. A.102, A.107). According to the petitioner, counsel chose not to call him and his wife as witnesses not because doing so would harm the defense, but only because the jury would likely discredit their testimony given their vested interest in the outcome of the case. (Dkt. No. 5-1, p. A.95, ¶ 25). The petitioner submits that this credibility concern was insufficient to outweigh the obvious benefit (indeed, necessity) of the testimony, and thus the decision not to call the petitioner and his wife rendered counsel's trial strategy unreasonable.

In denying the motion for a new trial, the trial court declined to credit the affidavits from the petitioner and his wife, describing them as "self-serving." (*Id.* at p. A.140). The trial court further found that the petitioner had waived his right to testify and that he had failed to show that his waiver was not voluntary or intelligent. (*Id.* at pp. A.139-A.140). As to the petitioner's wife, the trial court found that it was not manifestly unreasonable for trial counsel not to call her given her bias and that, in any case, her testimony would have been merely cumulative of evidence that had already been introduced. (*Id.* at p. A.140).

For its part, the MAC agreed and found that the trial court was entitled to discredit the affidavits. *Delibero*, 147 N.E.3d at 1127, *8. It pointed out specifically that the petitioner's affidavit contradicted in part the note that the petitioner gave

to his trial counsel after the close of the government's case to express some "concerns." *Id.* In that note, the petitioner said that it would "seem odd" if he did not take the stand after Raffa and Silvia did, but he did not indicate that he was prepared to testify that the victim referred to both men as "Papa." *Id.* The MAC found that the petitioner likely would have included that detail in the note if he intended to testify to that fact, especially given that he included details about other points on which he was prepared to testify. *Id.*

This court agrees that the trial court, as the court closest to the facts, unquestionably had the discretion to discredit the two affidavits based on the affiants' inherent bias. *See Forsyth*, 595 F.3d at 84-85; *Glacken*, 883 N.E.2d at 1234; *see also Scoggins*, 789 N.E.2d at 1085 ("The defendant's self-serving affidavits and assertions are not sufficient, on their own, to raise a substantial issue."); *Savage*, 746 N.E.2d at 1035 ("The judge need not have blinked the fact that the defendant's wife's affidavit possessed many of the same self-serving, conclusory, and impressionistic characteristics as the defendant's."). While the MAC pointed to the discrepancy between the petitioner's affidavit and his note to counsel as a reason why the trial court could have doubted the affidavit, that discrepancy is by no means the only basis on which

the court could reject the affidavits.[10]  The trial court's decision to discredit the affidavits was not unreasonable, nor was the MAC's affirmance.

Further, even if the petitioner and his wife had testified, their testimony would not have meaningfully helped the defense. Any testimony about the victim also calling Silvia and Raffa "Papa" would have been cumulative of evidence already in the record.[11] *See Gonzalez-Gonzalez v. United States*, 49 F. App'x 322, 325 (1st Cir. 2002) (decision not to call witness whose testimony "would have offered only cumulative impeachment" was not ineffective assistance); *Duguay v. Spencer*, 765 F. Supp. 2d 90, 96 (D. Mass. 2011) (citing *Commonwealth v. Britto*, 744 N.E.2d 1089, 1098 (Mass. 2001)) ("Where testimony would be cumulative of other testimony already presented, counsel's decision not to call a witness is not unreasonable.").  Any testimony about the circumstances under which Raffa babysat the victim by himself or that the Raffas kept the victim in a room with white walls would have been inadmissible

---

[10] The note did not mention the possibility of the petitioner's wife testifying, raise any concerns about her not testifying, or describe the purported contents of her potential testimony.  The trial court did not rely on or even mention the note in explaining why it was not unreasonable for the petitioner's trial counsel not to call her as a witness.  *See* (Dkt. No. 5-1, p. A.140).

[11] Any testimony about Silvia's home having white walls (consistent with how the victim described the location where he was abused) and the petitioner's home not having them would have also been cumulative.  A photograph entered into evidence at trial as Exhibit 8 clearly depicts a white wall within Silvia's home.  (Dkt. No. 5-1, p. A.112).  Another photograph, Exhibit 11, shows the petitioner's bathroom.  (Dkt. No. 5-1, p. A.110).  The petitioner describes the walls shown in the photo as "grey," (Dkt. No. 5, p. 89), but a reasonable person could describe them as white.

hearsay because the petitioner and his wife only knew that based on what the victim's mother had told them. *See* (Dkt. No. 5-1, pp. A.99, ¶¶ 14-15, A.104, ¶¶ 12-13); *Commonwealth v. Markvart*, 771 N.E.2d 778, 782 (Mass. 2002) ("[H]earsay not otherwise admissible under the rules of evidence is inadmissible . . . unless specifically made admissible by statute."). At best, the petitioner could have contested the victim's mother's testimony about the circumstances under which the petitioner once babysat the victim overnight. *See* (Dkt. No. 5, p. 83). The petitioner does not argue that the omission of this testimony was prejudicial enough to undermine confidence in the jury's verdict, nor is any such prejudice apparent to this court.

### 7.   **Cumulative Error**

The petitioner argues that even if none of the claimed errors individually deprived him of his right to effective assistance of counsel, their combined effect did. While the court "accept[s] the theoretical underpinnings of this argument," *United States v. Sepulveda*, 15 F.3d 1161, 1195 (1st Cir. 1993), the petitioner has failed to establish at every turn that his trial counsel performed deficiently or that he suffered undue prejudice. As such, the claimed errors, "in the aggregate, do not come close to achieving the critical mass necessary to cast a shadow upon the integrity of the verdict." *Id.*

## VI.  <u>CONCLUSION</u>

For the foregoing reasons, the Petition for a Writ of Habeas Corpus should be DENIED.[12]


                                        /s/ Donald L. Cabell
                                        DONALD L. CABELL, U.S.M.J.

DATED:  March 20, 2023

---

[12] The parties are hereby advised that under the provisions of Federal Rule of Civil Procedure 72(b), any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  *See Keating v. Secretary of Health and Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *see also Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L.Ed.2d 435 (1985).